EDWARD A. RANSOM, trustee,

56   149
s57   312.
62L 636|

*v.*

ANDREW H. BRINKERHOFF, GARRABRANT R. ALYEA and their wives, and THE HILLSIDE CEMETERY ASSOCIATION.

[Filed November 18th, 1897.]

1. Upon the facts stated in the opinion—*Held*, that the lands were not *bona fide* aliened by the executors and devisees of the testator, the whole arrangement being a family settlement.

2. The lands having been sold under execution, a bill was filed to set aside the deeds, and G. and the cemetery association were made parties with the widow and children. In the suit on the bond the only issue touching the lands had been whether the devisees received any benefit from them, and the jury had found that the lands were only of the value of $1.—*Held*, that the issue as to whether the lands were aliened in good faith was not *res judicata*, and the burden was on G. and the association to prove valuable considerations.

3. The widow and E. having surrendered their $6,000 mortgage to escape liability as devisees, and having actually escaped it, the parties to the suit on the bond were estopped to assert that any consideration was paid, and at least the lands not conveyed to the cemetery association were left liable to execution.

4. Where the lien cast upon lands for the debt of the ancestor, by the act for the relief of creditors against heirs and devisees, is enforced, the creditor is not entitled to the benefit of any positive additions put upon the lands by

Ransom v. Brinkerhoff.

the heir; and, other things being equal, the heir, in consideration of the rents and profits, must keep down the taxes and encumbrances.

5. Assessments for benefits caused by public improvements must be allowed to the heir.

6. Where a surety on an administrator's bond thereby admits himself to be presently indebted to the ordinary in a specific sum, for the use of certain infants, unless the administrator shall duly perform his duties as such, the surety becomes indebted as soon as the administrator makes default, so as to bind his lands, in case of his decease, though judgment on the bond has not been rendered.

7. The existence of stock or shareholders in a cemetery association is not contemplated or authorized by the act providing for the organization of such associations, and is not consistent with the scheme of that act; and such scheme is not altered by the supplement of March 4th, 1879; and certificates of stock issued by such an association can have no greater effect than as acknowledgments of indebtedness.

Final hearing on pleading and proofs.

*Mr. James B. Vredenburgh* and *Mr. Edward A. Ransom,* for the complainant.

*Mr. Luther Shafer,* for the defendants.

PITNEY, V. C.

This is, in effect, a bill by a purchaser of real estate at sheriff's sale, to set aside a conveyance made by the defendants in execution prior to the entry of the judgment, on the ground that such conveyance was without consideration, and void as to the judgment creditor.

The facts of the case are complicated.

The complainant is the oldest son and heir-at-law of Stephen B. Ransom, deceased, who, as trustee, took a conveyance from Addison Ely, who purchased the premises at sheriff's sale in trust for the real parties in interest.

The judgment under which the sale took place was in favor of the ordinary to the use of H. F. Watson and T. P. Watson, against the heirs, who were also the devisees, of George C. Brinkerhoff, deceased, viz., Kezia Van Riper, Andrew H. Brinkerhoff, Ellen Berry and Martha Alyea, upon a bond

Ransom v. Brinkerhoff.

given by one Frederick A. Watson as principal and George C. Brinkerhoff as surety, conditioned for the faithful performance by Watson of the duties of administrator of James S. Watson, the father of the *cestuis que trust,* H. F. and T. P. Watson.

Watson, the testator, died in 1872, and Brinkerhoff, the surety on the bond, died in March, 1879, seized of a tract of land containing about one hundred and fifty acres, seventy acres of which are meadow land and eighty acres are upland, and upon which were a dwelling-house and outbuildings. The upland was in the southerly edge of the city of Rutherford. At his death the eighty acres of upland were encumbered by a mortgage of $12,000 held by the Mutual Life Insurance Company. The seventy acres of meadow were unencumbered.

By his will, made shortly before he died, the decedent devised the use of the land in question to his widow, Kezia, for her life, if she remained single, but if she married—which she has done— then the use of one-third for life. Subject to this provision in favor of his widow, he gave to his daughter Ellen $15,000 and to his son Andrew $20,000, and ordered the residue to be equally divided among the three children. He appointed his widow and Ellen and Andrew executors, with power of sale, and stated as a reason for giving Ellen and Andrew a preference over Martha that he had already advanced large sums to her.

That tract of one hundred and fifty acres is the one here in question, and was conveyed by the executors and devisees, namely, the children and widow of the deceased, to Thomas W. Alyea (the nephew of Garrabrant R. Alyea, husband of Martha), by deed dated April 22d, 1882, for the named consideration of $10,000, and, by deed of the same date, Thomas W. Alyea conveyed the same to Andrew H. Brinkerhoff and Garrabrant R. Alyea, the consideration named being also $10,000.

The object of the bill is to set aside these conveyances, and one made by Andrew H. Brinkerhoff and Garrabrant R. Alyea to the cemetery association, presently to be mentioned, on the ground that they were not alienations in good faith which exempted the lands from execution upon a judgment founded

on the debt of the devisor under the second section of the "Act for the relief of creditors against heirs and devisees."

Andrew Brinkerhoff and Garrabrant Alyea executed a mortgage on the same premises, bearing the same date—April 22d, 1882—to the widow, Kezia, and to Ellen Berry, for $6,000, which was declared to be for a part of the consideration money of the conveyances just mentioned, and that the amount was due in equal proportions to the widow Kezia and to the daughter Ellen. In point of fact, no consideration, other than this mortgage, was paid for these conveyances. These papers were all executed at or shortly after the day they bear date, but were not recorded until the 7th day of November, 1883.

About the time of the execution of these two conveyances and this mortgage the defendants Andrew H. Brinkerhoff and Garrabrant R. Alyea organized the Hillside Cemetery Association (defendant herein) under the general statute, and by deed dated December 1st, 1883, acknowledged on the 30th of April, 1884, by Andrew H. Brinkerhoff and wife and Garrabrant R. Alyea, and on the 10th of July, 1884, by Martha Alyea, and recorded August 26th, 1884, conveyed to it about forty acres of the whole tract, being a piece nearly square in shape, out of the north corner, and being, in point of fact, the most valuable part of the land, including the mansion-house and buildings. This conveyance was declared to be subject to three mortgages—the one to the Mutual Life Insurance Company for $11,000, the one to Kezia and Ellen for $6,000, and a third, presently to be mentioned, for $3,000, to a Mrs. Noble, but did not, in terms, assume the same.

For a payment made on account, the Mutual Life Insurance Company, the holder of the first mortgage, released November 12th, 1883, from the effect of that mortgage about six acres at the northerly corner of the forty-acre lot conveyed to the cemetery association; at the same time the holders of the $6,000 mortgage released the same six acres from their mortgage. After the execution of these releases, but before the conveyance to the cemetery association, Brinkerhoff and Alyea borrowed from a Mrs. Noble $3,000 and executed to her their bond and

mortgage, dated November 8th, 1883, upon the six-acre tract above mentioned, being the mortgage mentioned in the deed to the cemetery association.

The result of these conveyances and mortgages was that the cemetery association held the six-acre tract subject only to the Noble mortgage, and held the remaining thirty-four acres of the forty-acre tract subject, with the remainder of the eighty acres of upland, to the payment of the $11,000 due on the mortgage to the Mutual Life Insurance Company and the $6,000 mortgage to the widow and daughter.

The $3,000 borrowed from Mrs. Noble was paid into the treasury of the cemetery association (prior to the execution of the deed to it), and was used to pay the arrears of interest and costs to the Mutual Life Insurance Company and $1,000 on the principal of their mortgage, reducing the debt to $11,000. In consideration of this payment the insurance company released, as we have seen, the six-acre lot covered by the Noble mortgage, which lot was subsequently actually used for cemetery purposes. Moneys were expended on that six-acre lot in preparing and laying it out in lots for a cemetery, and considerable sales of burial plots have been made and moneys received therefor.

The consideration expressed in the deed from Brinkerhoff and Alyea to the cemetery association was $75,000, but, in point of fact, no consideration in cash was ever paid. The stock of the association to that amount—$75,000—was issued wholly to Brinkerhoff and Alyea, and almost all of it is held by them, a few shares only being held by other persons who act as directors and officers with Brinkerhoff and Alyea. The several deeds of conveyance from the heirs to Thomas W. Alyea, and from Thomas W. Alyea to Andrew H. Brinkerhoff and Garrabrant R. Alyea, and from the latter to the Hillside association, all mention the mortgage to the insurance company. In the first two deeds the mortgage is merely mentioned by way of description of the premises—that they are the same premises mortgaged to the insurance company. The deed to the cemetery association declares that the premises are conveyed " subject, nevertheless, to three mortgages now on the premises," mentioning them.

There is nowhere in the three deeds in question any clause which can be construed to be an assumption by the grantees of the mortgages or either of them. At the hearing, however, Mr. G. R. Alyea swore that the verbal agreement between him and Brinkerhoff and the cemetery association was that the forty-acre tract conveyed to the cemetery association was to assume all those mortgages, and that the forty acres of upland which they retained were to be free and clear; but that it was not a part of their plan to ask the insurance company to release those forty acres upon the mere security of the forty acres conveyed to the cemetery association, and they still remain subject to it. The meadow land, as we have seen, is free from encumbrance.

The suit upon the bond was commenced by summons returnable on the 9th of July, 1890, and served upon each of the defendants. The declaration in that suit, after alleging the making and the breach of the bond, stated that the deceased Brinkerhoff died seized of valuable real estate situate in the township of Union, in the county of Bergen, of the value of $50,000, which he by his will devised to Kezia Van Riper, Ellen Berry, Andrew H. Brinkerhoff and Martha Alyea, which lands and tenements the said devisees still hold. The defendants all appeared, and joined in one pleading containing several distinct pleas. The *first* plea was *non est factum*, putting in issue the making of the bond. *Second,* they denied the breach of the bond by the administrator, and alleged that he performed all the conditions of it. In the *third* plea, A. H. Brinkerhoff and his sister, Mrs. Berry, severed from Mrs. Van Riper and Mrs. Alyea, and set up *rien pur devise*, except the equity of redemption of a farm of about one hundred and forty acres, which at the time of the death of Brinkerhoff was of small value, to wit, $1 and no more, and which before the commencement of the suit the said defendants sold, aliened and made over. The *fourth* plea was by the defendant Kezia Van Riper, likewise a plea *rien pur devise*, except a life estate in one-third of the equity of redemption of the farm in question, which at the time of the death of Brinkerhoff was and now is of small value, to wit, $1, and which before the commencement of the suit the defendants sold, aliened and made over.

*Fifth,* Martha Alyea pleaded separately, setting out the will of Brinkerhoff *in extenso, rien pur devise,* except the equity of redemption in the tract in question, which was insufficient to pay the preferential devise in favor of her brother Andrew and sister Ellen; and that the defendant in fact had received no part of the real and personal estate of Brinkerhoff as devisee. *Sixth,* Andrew and Ellen also pleaded separately, setting out the will in full, and stating that the property devised was of small value, to wit, $1 and no more, and that it was insufficient to pay to Andrew and Ellen their preferential legacies, and that the defendants had never received any part of the estate of George C. Brinkerhoff as devisees under his will.

The plaintiffs in their replication took no notice of the allegation that the defendants had aliened and made over the lands, but joined issue as to their value.

In the month of August, 1890, and at about the time the pleas in this suit were due, the mortgage for $6,000 given by Garrabrant R. Alyea and Andrew H. Brinkerhoff to Kezia Van Riper and Ellen Berry was canceled of record, and Andrew conveyed his one-half interest in the one hundred and ten acres not conveyed to the cemetery association to Alyea for the expressed consideration of $1, and after the verdict in the suit Alyea reconveyed this one-half interest to Brinkerhoff for a like expressed consideration of $1.

The issues raised by the pleadings were tried in December, 1890, and judgment rendered February 17th, 1891, in favor of the plaintiff, for $50,000, the penalty of the bond, to be levied of the lands, &c., of which George C. Brinkerhoff died seized. The postea shows that the jury found (1) that the bond was the deed of George C. Brinkerhoff, deceased; (2) that Frederick Watson, the administrator, did not well and truly administer, &c., the goods and chattels, &c., of James S. Watson, deceased, that came to his hands; did not make a just and *true* account of his administration thereof; did not in all things well and truly perform his duties as such administrator; (3) that the value of the farm that came to the two defendants Andrew H. Brinkerhoff and Ellen Ann Berry, subject to the life estate of

Kezia Van Riper, was $1 and no more; (4) that the life estate of the defendant Kezia Van Riper in the equity of redemption was the value of $1 and no more; and further (5) that the defendant Martha Alyea did receive by devise and have divers lands and tenements of George C. Brinkerhoff as devisee under his last will and testament to the value of $1 and no more, in manner and form as the said plaintiff hath in that behalf alleged.

After the entry of this judgment the defendants applied to the ordinary to assess the damages to be levied, and the ordinary ascertained the damages at the sum of $39,764.81, as of the 25th of August, 1892.

It further appears in the proofs made at the hearing that the defaulting administrator was called to account in the orphans court in the lifetime of George C. Brinkerhoff, and with his knowledge, and that he was then found in default; and further, that in the fall of the year 1883, and shortly after the *cestuis que trustent* became of age, they employed counsel to prosecute the affair, and that in the latter part of the year 1883, or in the early part of the year 1884, and before the deed from Brinkerhoff and Alyea to the cemetery association was executed, the counsel so employed called upon Brinkerhoff and Garrabrant R. Alyea and told them that he was employed by the two young Watsons to prosecute the bond and try and collect the money. Proceedings were had in the orphans court of Bergen county against the defaulting administrator, and an examination had before Thomas M. Moore as a master in the first three months of the year 1884.

In order to explain the suspicious circumstances of the cancellation of the $6,000 mortgage given to the widow and Mrs. Berry, and the conveyance by Andrew Brinkerhoff to his brother-in-law, Alyea, in the month of August, 1890, which was about the time that the pleas in the action on the bond were due, the defendants swore that the bond and mortgage, though expressed on the face of the mortgage to be a part of the consideration named in the deed for the conveyance to Brinkerhoff and Alyea, yet, in point of fact, were subject to a verbal agreement between the parties that the mortgage should only be enforced in case the

project of a cemetery should prove to be financially successful. No written agreement to that effect was made. Interest was paid upon the mortgage for two years, and is endorsed on the bond. Then there is endorsed on the bond, and signed by the widow and Mrs. Berry, an agreement dated October 18th, 1889, ten months before the cancellation, releasing the interest up to that date and such as should thereafter accrue, " according to an agreement of even date herewith and made part hereof;" and the payment of the principal was extended for seven years from October 22d, 1889. An agreement to the same effect was endorsed on the mortgage. When asked to produce the agreement so referred to, Mr. Alyea declared that it was a verbal agreement, and that the reason the mortgage was canceled was that it had been proven to their satisfaction that the cemetery association was not a success, and that the parties had voluntarily, and without any consideration, delivered up the mortgage to be canceled.

This explanation must be considered in connection with the logic of the situation, which was, that if it appeared at the trial of any issue that could be raised in the suit on the bond that either of the devisees had received anything of value upon a sale and conveyance of the land devised, they would be liable to a judgment to be entered against them personally for the amount so received; also in connection with the written agreement of October, 1889, endorsed on the bond and mortgage, extending payment seven years. No explanation was made of the change of the minds of the parties between October, 1889, and August, 1890.

With regard to the conveyance made about the same time by Brinkerhoff to Alyea of the former's half interest in the premises, in consideration of $1, Alyea swears that the real consideration of that was to be $1,000, but that he was unable to pay it at that time, and that he reconveyed the half interest to Brinkerhoff, by deed dated February 2d, 1891, but not acknowledged until August, 1891, or recorded until September, 1891, because he had been unable to raise the money to pay Mr. Brinkerhoff the $1,000 agreed upon. Another deed is produced at the hearing,

from Brinkerhoff to Alyea, dated April 6th, 1893, acknowledged April 19th, 1893, also in consideration of $1, conveying the grantor's half interest in the premises, which the parties swear was actually delivered to Alyea, but not put upon record, and for which Alyea swears he actually paid Brinkerhoff $1,000, all in pursuance of the original agreement of 1890.

Now I am unable to accept the explanation given of the cancellation of this $6,000 mortgage and the making of these three deeds.    Mr. Garrabrant R. Alyea was sworn on the trial of the suit on the bond as to the value of these premises, and produced the deed that he had from Brinkerhoff in consideration of $1, and must have sworn that the property was of no value, because the jury so found.    And yet, according to his evidence on the hearing of this cause, he had already agreed to pay Mr. Brinkerhoff $1,000 for his interest in the premises not conveyed to the cemetery association.

The circumstances indicate very strongly that these conveyances were made, and the mortgage canceled, in order to show that the property was of no value, and that the verdict of the jury was based on that showing.

Another object of the conveyance from Brinkerhoff to Alyea was to show that the title to the lands had been aliened by each of the devisees.    For the two conveyances of April, 1882—one from the devisees to Thomas W. Alyea, and one by him to Andrew H. Brinkerhoff and Garrabrant R. Alyea—were, palpably, one transaction, and did not show any alienation by Andrew H. Brinkerhoff.

Both parties claim an estoppel as against the other from the *postea* and judgment in the suit on the bond.

I am unable to perceive how the judgment record can create any estoppel as to Alyea and the cemetery association, either for or against either, for several reasons.    In the first place, neither was a party to that record, nor privy to any party thereto ; and therefore neither is bound by it.    The familiar rule is that estoppels of that character must be mutual, and bind both parties to the record, or neither.    In the second place, the issue in that suit was quite different from that in this.    There (omitting, of

course, the issues which settled the responsibilities of the ancestor and devisor for the debt demanded) the issue was whether the lands which the devisees claimed to have aliened before writ purchased were of any value so as to charge them personally with such value; and as soon as the jury determined that they were of no value the question whether or not they had been aliened at all, either in good or bad faith, became immaterial, for in either case the defendants were not personally liable. In fact, the record shows that no issue was made up or tried as to whether they were or were not aliened in good faith, so as to relieve them from execution under the latter part of the second section of the "Act for the relief of creditors against heirs and devisees." Such issue could not be properly injected into that record, because the alienees were not parties to it, and could not be bound by the finding of the jury and judgment thereon.

At common law there could be no recovery against the heir-at-law personally upon the debt of the ancestor by reason of lands descending to him, even if he had aliened those lands for and had received a valuable consideration. A judgment at common law against the heir-at-law was always special, to be levied upon the lands of the ancestor which had descended to him. But now, by statute, both the heir and devisee are made personally liable for the debt of the ancestor by reason of lands descended or devised to him, so far, and no farther, as he has received either rents or profits before their alienation or consideration upon alienation. The just rule that the heir or devisee, except when he shall plead falsely or fail to plead and disclose assets, shall be held liable to the extent only that he has received assets, is not disturbed by the statutory scheme. *Muldoon* v. *Moore*, *26 Vr. 410*, and authorities there cited, viz., *Bac. Abr. tit. "Heir" (F)*; *Com. Dig. tit. "Assets" (A)*; *2 Saund. 7, note 4*; *Herbert's Case, 3 Coke 11*; *Vin. Abr. tit. "Heir" (C)*; *Com. Dig. tit. "Pleader" (2 E 5)*. The note 4, *2 Saund. 7*, is exhaustive and particularly instructive.

At common law there was a difference of opinion and some contrariety of decision as to whether, if the declaration against the heir (founded upon a specialty which mentioned the heir)

did not specifically allege that lands had descended to the heir, he could be held personally liable upon a judgment against him by default.    But this uncertainty was settled by the statute of *3 William and Mary, c. 14,* and under that statute (section 3 of our act) it was held that the declaration against the heir need not allege lands by descent, but that such descent would be presumed, and the burden was in all such cases thrown on the heir to disclose by plea all lands cast upon him by descent, and if none had descended, to plead *rien pur descent,* and so are the precedents. But in the case of actions against devisees the precedents allege that the defendant was the devisee of certain lands, &c., without specifying them.

But for this peculiar rule of pleading I should have said that all the issues in the suit at law, except the first two, viz., *non est factum* and performance of the condition of the bond, were immaterial, and that if the defendants had allowed judgment to go against them by default the result would have been precisely the same, namely, judgment would have been given specially to be levied of the lands of the decedent.    The finding of the jury that the bond was the debt of the devisor and that its condition had been broken, entitled the plaintiff at once and quite irrespective of the other issues, to a special judgment against the devisees, to be levied of the lands of which the devisor died seized, without regard to their value.

The result, then, is that the jury found, in effect, that the lands that were devised to the devisees were only of the value of $1, and left them, so far as the parties to this record are concerned, still subject to the lien of the judgment, and liable to be levied upon and sold to pay the ancestor's debt.

This finding, however, does not prevent Garrabrant R. Alyea or the cemetery association from proving—but leaves it necessary for them to prove—that they had, in fact, purchased these lands for a valuable consideration, in order to bring themselves within the saving clause at the end of the second section of the "Act for the relief of creditors against heirs and devisees," which provides that lands which were *bona fide* aliened before action brought shall not be liable to execution.    This, however, they

have failed to prove.   No direct consideration has been paid, as we have seen, nor was there any valuable consideration by way of assuming and relieving the heirs-at-law of the debts secured by mortgage on the premises.   The whole arrangement was one made by the family, and understood by each of them, as appears by the evidence, to the effect that these lands should be conveyed in the way and for the purposes they were conveyed, and that a mortgage of $6,000 should be given to the widow and the daughter, who each had a preferred legacy, which was a lien on the lands, and that Andrew's preferred legacy was satisfied by his receipt of a one-half interest in the whole venture, subject to the mortgage to his mother and sister.

Mrs. Berry and Mrs. Van Riper having delivered up their mortgage to be canceled, in order, as I infer, to escape liability as devisees, and having actually escaped such liability, all parties to the record of the suit at law are now estopped from setting up as against the plaintiff therein or the purchaser at sheriff's sale that any consideration whatever was paid.   This estoppel prevents the revival of that mortgage as against the cemetery association and Alyea, and, as it seems to me, leaves the one hundred and ten acres not conveyed to the cemetery association clearly liable to the execution, and results in placing the title in the complainant.

Against this position it was urged by the defendants, in the first place, that according to the doctrine advanced and adopted in the case of *Severs* v. *Dodson, 8 Dick. Ch. Rep. 633*, there was no debt against the ancestor at the time of the death of Brinkerhoff, nor, indeed, until judgment was actually rendered on the bond in February, 1891.

The proof is that the breach of the condition of the bond occurred in Mr. Brinkerhoff's lifetime, and that he had notice of it.   But in order to complete the breach it was not necessary that he should have notice of it.

Without going into any discussion of the exact point decided in *Severs* v. *Dodson*, I think it is sufficient to say that the liability there dealt with is decidedly different from that here in question.   There the decedent was contingently liable under the

law-merchant as an accommodation endorser of a promissory note. Here the deceased had executed a bond under his seal, by which he admitted himself to be presently indebted to the ordinary, for the use of the infants, in the sum of $50,000, upon the condition that it should stand in full force and virtue unless the administrator, Watson, performed his duties as such. He failed in such performance in the lifetime of Brinkerhoff, and Brinkerhoff then became indebted to the ordinary in the sum of $50,000, and died so indebted.

Some of the defendants testified that the deceased testator supposed that this matter of the administration of Watson had been entirely settled before his death, and that he was very much pressed with the weight and burden of the large mortgage on his premises, and declared that "something must be done about it." The complainants allege that in that expression he referred to his liability on the Watson bond. If it were necessary to decide the question, I should say that the complainant had the better of the argument; for we find the deceased, three months before he died, making a will based on the notion that he was worth $35,000 or $40,000. But I do not think it necessary. That there was a debt due by him to the ordinary at the time of his death is too clear for argument.

With regard to notice of that debt; the family were aware that proceedings had been taken against the administrator in the orphans court of Bergen county. They say that the father told them that the affair had been settled. Admitting all that, still they were aware of the alleged default, and thereby put upon inquiry; and if the matter of notice to the heirs in general of the existence at all times of this indebtedness were a material element in the decision of this cause, I should feel constrained to charge them with such notice. But be that as it may, it is too clear for argument that both Brinkerhoff and Alyea had notice of it from the counsel of the Watsons before they had taken any irretrievable step in the cemetery enterprise. As we have seen, notice was given to each of them before the execution of the deed to the cemetery association. They were at once the promoters of the association, and its sole proprietors and manag-

ing officers, so that the corporation, as such, is chargeable with all the knowledge which they had. When the land was conveyed to the cemetery the lien of this debt was resting upon it within the knowledge of all parties.

I do not perceive that the fact that shares of stock have been issued to the two proprietors changes the situation. The Cemetery act nowhere directly authorizes the creation or issuing of certificates of stock in such association. By the tenth section (*Rev. of 1876 p. 102*), it is declared that after paying the purchase-money, if any, of the lands purchased for a cemetery, the proceeds of the sale of burial lots shall go for the care and improvement of the grounds; and by the sixth section (*p. 101*), the trustees are to be selected from among the owners of burial plots, and elected wholly by the holders thereof. The existence of stock or shareholders is not contemplated by the act, nor consistent with the legislative scheme. In order to remedy the manifest injustice of giving to the lot-owners alone the control of the affairs of a newly-launched cemetery association still being indebted for the purchase-money of its lands, the legislature, by supplement of March 4th, 1879 (*Rev. Sup. p. 74*), provided as follows:

"And for the purpose of electing trustees at any meeting after organization of the association, every *creditor* of such association, in addition to his right to vote by virtue of his owning plots or lots according to section five of this act, shall be entitled to one vote for every four hundred dollars' worth at par value of bonds, stock or other duly-authorized evidences of debt he or she may own and hold against such association."

By implication, this language recognizes the right of the association to make use of the machinery of certificates of stock to manifest a debt owing by it; but, clearly, it left the holder a mere creditor, and no more. For it is as a creditor only that he is authorized to vote for the trustees.

It was said at the hearing that a few shares of the stock issued to Brinkerhoff and Alyea had been assigned to some third person. It is improper to decide at this time whether or not such holder, who is not a party to this suit, can, under any circumstances, be

Ransom v. Brinkerhoff.

held in any sense a *bona fide* purchaser in such manner as to be, as to his share, relieved of the lien upon this land.

It thus appears that the grantees whose title is impeached are not possessed of any of the elements of *bona fide* purchasers without notice. In the first place, they had notice of the statutory lien cast upon the lands for the debt of the ancestor; and, in the second place, they paid no consideration.

But it is further urged, first, that moneys have been spent and improvements made on these premises by the purchasers; and, second, evidence is offered to sustain the finding of the jury that they were of no value at the decease of the ancestor or at the time of these conveyances; that they had no value over and above the encumbrances, and, in fact, that they have no value now over and above the encumbrances, except what has been put upon them by the labor and expenditures of Garrabrant R. Alyea.

The rule as to improvements was discussed and settled, as I think, in *Fredericks* v. *Isenman, 12 Vr. 212.* That, indeed, was a case where the lands had been aliened by the heirs in good faith, and the question was upon the amount of the recovery against the heirs. But the principle there adopted applies here. The creditor of the ancestor or devisee is not entitled to the benefit of any positive additions put upon the lands by the heir; and, other things being equal, the heir, in consideration of the rents and profits, must keep down the taxes and encumbrances. The rule thus stated is a just one.

It appears in this case that considerable arrears of taxes accrued, mainly, as I understand the evidence, after the death of the testator, and some assessments for street improvements were made, but whether before or after the death of the testator I think the proofs do not show. Then there were improvements made upon the cemetery grounds, mainly, as I understand the proofs, on the six-acre lot. Mr. Alyea claims that the association is largely indebted to him for money advanced, by which these improvements were made, over and above what he has received in payment. I think he is entitled to those advances, if any.

The heirs, or some of them, were in possession of the homestead and lands until the arrangement of 1882 was entered into, and since then, as I understand, they have been in the use and occupation of Mr. Alyea and his wife. However, on these points very little proof was made.

The result is that if the defendants claim for taxes, insurance and repairs, they must account for rents and profits. If they do not claim for those disbursements, then, as at present advised, I think there should be no account taken as to rents and profits, or insurance, taxes and repairs of all those lands not included in the grant to the cemetery association. Assessments for benefits caused by public improvements stand on a different footing, and, as at present advised, I think they must be allowed to the tenant.

With regard to the lands granted to the cemetery association; the proofs do not show whether or not the funds of the cemetery association were applied to any of the grounds outside of the six-acre lot specially devoted to cemetery purposes and released from the life insurance company's mortgage. If they were not, and those grounds were used for farming purposes in connection with the mansion-house, then they stand on the same footing as the other with regard to taxes, &c.

There should be no difficulty in taking an account of the receipts and disbursements of the cemetery association, in which, of course, they must be charged with the mortgage given to Mrs. Noble, and credited with payments made up to that time on account of assessments for improvements and on account of the principal of the insurance company's mortgage.

Mr. Alyea claims that he has rendered large services to the cemetery association. There was no proof, however, as to what salary he was to receive, or did receive, but he is entitled, of course, to a reasonable compensation for his services.

The general increase, if any, in value of the land irrespective of these improvements, must go to the benefit of the creditors.

I will advise a decree for complainant, with an order of reference to take an account of the matters referred to, the details of which will be settled after further hearing of counsel.

In order to enforce this decree it is not necessary that the title

of the cemetery association to a proper and reasonable amount of the land conveyed to it should be disturbed. The evidence is not clear as to how much has been actually devoted to cemetery purposes, or as to how much ought, under the circumstances, to be so devoted. So far as the evidence goes, I should infer that only the six acres covered by the Noble mortgage and released from the insurance company's mortgage were so devoted. But if the parties cannot agree upon that, there may be a reference to a master to determine it.

The decree as to the cemetery association will be enforced as follows: Brinkerhoff and Alyea must assign to the complainant all the stock of the cemetery association; a reasonable appraisement must be made of the value of the lands so devoted to cemetery purposes at the time they were so devoted, and the amount so fixed, with interest, declared to be an indebtedness to the grantors which will be represented by the certificates of stock so assigned; and such indebtedness, after allowing for the Noble mortgage, and subject to the account to be taken of the receipts and disbursements and general indebtedness of the cemetery association, will be held to be a debt to be paid from the sale of lots, according to the scheme of the statute.